not chargeable with the consequences of a place for work made dangerous only by the carelessness and neglect of a fellow servant (Hussey v. Coger, 112 N. Y. 614–618, 20 N. E. 556), although that fellow servant happened to be the foreman."

*After considering and distinguishing many cases, the court added:*

"The master furnished the mine as a place for labor, and it was solely on account of the manner in which the foreman, a fellow servant, performed the work, or directed it, that the accident happened, and happened in the course of the performance of the very kind and character of work which the plaintiff's intestate took the risk of by accepting employment."

The same general rule was applied in Kimmer v. Webber, supra, where the foregoing cases were referred to with approval. We think it must be said that the cases referred to are conclusive in support of the order from which this appeal is taken. Here the only negligence alleged is that the foreman set the plaintiff to work to clear out this hole, without disclosing the fact that there was dynamite in the charge. This was, however, but a detail of the work intrusted to the judgment and discretion of the foreman. The foreman, as well as the plaintiff, was a servant engaged in the performance of the work of blasting, preparing the holes, inserting the charges, exploding the blasts; and, when the charge did not go off, the cleaning out of the holes was a necessary and proper part of the general employment. The master furnished a competent foreman, all the tools and implements necessary, and gave the foreman power to employ and discharge men. He left the details of the work, the method to be employed, entirely to the foreman; and in carrying out the work the method adopted was that of the employé, rather than that of the master; and any negligent acts or omissions with reference thereto were not chargeable to the master, but were the acts of the co-employés, which the plaintiff assumed the risk of, as incidental to the dangerous work and employment upon which he entered, and in which he was engaged at the time of the accident.

Our conclusion is that the order appealed from should be affirmed, with costs.

VAN BRUNT, P. J., and INGRAHAM, J., concur.    PATTERSON and O'BRIEN, JJ., concur in result.

---

(14 App. Div. 611.)

CAMPBELL et al. v. NEW YORK LIFE INS. CO.

(Supreme Court, Appellate Division, Second Department.    March 2, 1897.)

1. CONTRACTS—WAIVER OF PERFORMANCE.
   No recovery can be had for failure to advance money according to contract with plaintiff's testator, where defendant has applied such money with the acquiescence and on the written order of testator.

2. SAME—STIPULATION FOR JUDGMENT—EFFECT OF ENTRY.
   The entry of a judgment for plaintiff in a foreclosure suit does not bar the rights of defendant under a written contract, pursuant to which the judgment was entered.

Appeal from trial term, New York county.

Transferred from the First department.

Action by Joseph Campbell, Martha Campbell, and Emma Campbell, as executors of the will of William Campbell, deceased, against the New York Life Insurance Company, to recover $1,489,500 as damages for an alleged breach of contract. From a judgment on verdict for defendant, and an order denying a motion for a new trial, plaintiffs appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

B. C. Chetwood and J. Alexander Koones, for appellants.
William B. Hornblower, for respondent.

HATCH, J. Except as developed upon the trial, it is somewhat difficult to determine upon what theory the plaintiffs seek a recovery in this action. The complaint contains 62 paragraphs, wherein are set out several transactions between the firm of Phyfe & Campbell, who are plaintiffs' assignors of the claimed cause of action, and the defendant. The transactions thus set out are somewhat complicated, are quite confusing, and are not in all respects harmonious. Some of them appear to be entirely immaterial to any cause of action; others have a tendency to state a cause of action, but seem insufficient for that purpose. It becomes practically unimportant, however, to particularly challenge the specific allegations of the complaint at this time, for the defendant answered the complaint upon the allegations as therein framed, and proceeded to a trial without at all questioning it in any respect. The parties, therefore, came to the trial of this case with issues in many respects quite indefinite, and it is quite easy to see that, under these circumstances, the proof might take, as it did to some extent, quite a wide range. In an early stage of the trial, however, the issues assumed definite form, and the questions submitted to the jury by the court, while admitting of extended examinations and voluminous testimony, became narrow in compass. Before proceeding to state what these questions were, it becomes necessary, to their proper understanding, that we take a survey of the facts, and also dispose of some minor questions which have been called to our attention. Phyfe & Campbell were a firm of builders carrying on business in the city of New York. In October, 1883, they purchased of John C. Anderson certain property situate upon what was called the "Fifth Avenue Plaza," between Fifty-Eighth and Fifty-Ninth streets, in the city of New York, upon which now stands the Plaza Hotel. The purchase price for this property was $850,000, of which Phyfe & Campbell paid $50,000, giving back mortgages to Anderson for $800,000. They immediately began to improve the property, and began the erection of an expensive building thereon. To enable them to make the improvement, they applied to the defendant for loans, making three several applications: The first, on May 1, 1884, for $510,000; the second, on March 30, 1885, for $150,000; and the third, on February 27, 1886, for $200,000. These sums of money were advanced by the defendant to Phyfe & Campbell, were secured by their

bond, and by mortgages upon the premises, and the lien of Anderson's mortgages was made subordinate thereto. These three loans amounted in the aggregate to $860,000. In the second application for the loan it was recited that it was understood that Phyfe & Campbell at the time of negotiating the first loan would erect on the lot a "first-class, fireproof building." The sums included in the last two loans were advanced upon the understanding that they were to be used in the construction of the building, and they were so used except as we shall presently note. This money on the last two loans was held by the company through its agent, and paid out upon orders given by Phyfe & Campbell, checks for which were produced upon the trial. Of the last $200,000, but $140,000 was actually used for purposes of construction. The remaining $60,000, also paid by checks indorsed by Phyfe & Campbell, was applied in payment of interest due the defendant for prior loans and taxes levied upon the property. It was alleged in the complaint that only $140,000 of the last loan was advanced by the defendant, in consequence of which Phyfe & Campbell were greatly embarrassed about the construction of the building and damaged in consequence. Upon the trial this claim was made and proof was given in respect thereto. But it was admitted finally that the whole sum was advanced by the defendant, although $60,000 was applied as heretofore stated. The court held that the whole amount of the loan was advanced, and that no claim for damage could be predicated thereon.

This ruling was correct, for at the time when this money was applied it was so applied with the knowledge of Phyfe & Campbell. They indorsed checks therefor, and at the time raised no objection to such disposition of the money. Plaintiffs cannot now be heard to say that it was improperly applied, or that they suffered damage therefrom, for an act in which Phyfe & Campbell at the time acquiesced, and for an application of the money which discharged their debt. These three loans were called "temporary loans," and it was understood between the parties that when the building reached an advanced stage of construction the defendant would make a permanent loan, which should embrace the temporary loans and any further sum which might be agreed upon. The permanent loan was never made, and claim of damage was made on account thereof in the complaint. Phyfe & Campbell claimed to have had another party who would have advanced money sufficient for their needs in form of a permanent loan, but the defendant insisted upon its option to make it. The claim of plaintiffs in this respect is exceedingly indefinite; it does not appear to have been seriously pressed upon the trial; it was not submitted to the jury by the court; and no request was made for its submission. We can find nothing in the record which would justify a recovery in plaintiffs' favor upon this claim, and must conclude, from the attitude of all the parties in respect to the course of the trial, that such claim was abandoned, and therefore requires no further consideration by us. In November, 1887, Phyfe & Campbell were in default for nonpayment of interest upon the loans made by the defendant, and the latter began

proceedings to foreclose its mortgages. These proceedings ripened into a judgment of foreclosure, and sale of the premises upon the 26th day of April, 1888, for the sum of $973,241.67. At this time there were liens existing upon the property subject to this judgment, in quite a large amount, held by various parties. These lienors were represented by mortgages, judgments, and mechanics' liens, among which was Anderson, who still held his mortgages, reduced somewhat in amount, and Charles A. Peabody, who represented certain holders of bonds issued upon the faith of the structure, as trustee of a mortgage to secure their payment. While the proceedings to foreclose the defendant's mortgages were in progress, Mr. Phyfe, of the said firm of Phyfe & Campbell, applied to the defendant to arrange the matters, and procure an extension of sale under the judgment of foreclosure. At this time papers in the foreclosure proceedings had not been served upon the wife of Phyfe, who lived in the state of New Jersey. It was also claimed that some parties were intending to interpose a defense to the foreclosure action. It was testified by Phyfe that, within a week or 10 days after the commencement of the foreclosure proceedings, he saw Mr. Welch, the second vice president of defendant, and who acted for it, and laid before him offers which Phyfe had received to lease the hotel when completed, from which it appeared that enough money would be received, if the scheme could be carried out, to pay all interest and taxes, care for all liens, and leave a surplus for Phyfe & Campbell. Upon this showing Welch agreed that if Phyfe would aid in procuring parties to appear in the foreclosure action, and remove all obstacles in the way of procuring final judgment therein, defendant would not enforce the judgment of foreclosure, but would give Phyfe & Campbell three years to pay the amount of principal and interest from the 1st day of the following September, they procuring responsible parties who would agree to pay the defendant upon the 1st day of each month, beginning with September 1, 1888, one month's interest, and in December or January the year's taxes longest due. Phyfe & Campbell were to procure subsequent lienors to postpone their liens and subordinate them to this arrangement, and, if this was carried out, the defendant would execute an agreement embodying its terms. It is conceded that no agreement in writing was made between Phyfe & Campbell and the defendant. But it is shown that about February 17, 1888, the defendant wrote a letter to Mr. North, an attorney representing John C. Anderson, which embodied the oral agreement entered into between Phyfe & Campbell and the defendant. This letter was modified and superseded by one written April 12, 1888, which is as follows:

"New York Life Insurance Company, 346 & 348 Broadway.

"New York, April 12th, 1888.

"T. M. North, Esq., of North, Wagstaff & Ward, New York City—Dear Sir: As the parties now proposing to lease the Plaza Hotel are not the ones who had it in contemplation at the date of my last letter to you, I send you this as a substitute. The New York Life Insurance Company agrees with the lessors and lessees named in the said lease that it will not, for the period of five years from

September 1st, 1888, enforce, by sale of the mortgaged premises, any judgment of foreclosure it may obtain in the action now pending for the foreclosure of its mortgages on said hotel: Provided—First, that the parties to said lease shall complete and furnish the Plaza Hotel in a manner suitable to a first-class city hotel by September 1st, 1888; second, that said parties shall, from the rent of said hotel or otherwise, pay to said New York Life Insurance Company, on the first day of every month, beginning with September 1st, 1888, one month's interest, at 6%, on the judgment of foreclosure in favor of said company, or until the same shall have been obtained on the mortgages held by said company, on the said Plaza Hotel premises, and on the interest and expenses then due; third, that said parties shall, from said rent or otherwise, on the first day of January in each of said five years, or within 30 days thereafter, pay one year's tax on said Plaza Hotel, namely, that tax which has been due the longest time, and also any assessments which may be laid upon said premises during each and every of said five years, and all premiums for insurance on the Plaza Hotel to the full amount now insured thereon; also the annual water rate on or before August 1st in each year. This agreement is to be binding on said company only until the failure on the part of the parties to said lease to comply with any of the above conditions, in the event of which failure for ten days the said company shall be at liberty to proceed to a sale of said mortgaged premises, under the judgment in said foreclosure action, and this agreement shall become void. It is agreed and understood that the owners of said property shall afford the New York Life Insurance Company all facilities in their power towards obtaining judgment in said foreclosure suit.

"Very truly yours,                    A. H. Welch, 2nd Vice President."

It is not claimed that the oral agreement between Phyfe & Campbell and the defendant was different from the terms contained in the letter. On the contrary, plaintiffs rely upon the letter as establishing the terms of the oral agreement, and it is in this view that we consider it. It stands undisputed that Phyfe procured the appearance of his wife in the foreclosure action after the oral negotiation. And the claim of plaintiffs now is that Phyfe & Campbell fulfilled to the letter all of their engagements with the defendant, and that the latter was guilty of a breach of its engagement to them, by which they sustained a loss of all interest in the hotel property, and suffered damage in a sum amounting to more than $1,500,000, which plaintiff, as assignee of Phyfe & Campbell, is now entitled to recover. It is this agreement and its breach which became the issues of the trial, and upon which the plaintiffs must now stand or fall. Aside from the question of damages, the court submitted to the jury two main questions: First. Was a binding agreement made between Phyfe & Campbell and the defendant whereby the latter was to postpone enforcement of its judgment of foreclosure for a period of five years? Second. Was the contract, if made, broken by the defendant? Upon these questions it is claimed by the plaintiffs that the verdict was against the weight of evidence in their favor, which calls for a reversal of the judgment.

It is claimed by the defendant that the judgment of foreclosure and sale constituted a bar to plaintiffs' action; if not a bar, that it never made any binding agreement; that, if the letter be treated as an agreement, it was never complied with by Phyfe & Campbell; and that in fact the failure to carry out the arrangement was due to Phyfe & Campbell, who failed to procure the consents and lease for which the contract stipulated. We do not think that the judgment constituted a bar to the action. The agreement was made in

contemplation of the entry of judgment; in fact, provided for it. The stipulation related to its enforcement, so that whether the judgment was entered or stood ready for entry could not legally change the effect of the agreement, as either condition might exist under it, at the option of the defendant. The consideration for such extension was good, for, if carried out, it relieved the defendant of resorting to a proceeding to obtain substituted service upon the nonresident defendant, which was a distinct advantage to it; and, in addition to this, it was to obtain an engagement by responsible parties which secured the payment of its judgment and interest charge, the discharge of taxes which were a lien superior to the lien of its mortgages and judgment, and also secured the completion and furnishing of the building by September 1, 1888, as a first-class hotel. It was quite competent for the parties to make such an agreement, and the entry of judgment thereunder would not affect its terms or change its binding force. We are to bear in mind, however, that the loans made by the defendant to Phyfe & Campbell were the superior liens, and that in the record before us nothing appears which is legally sufficient to establish any defense existing in favor of Phyfe & Campbell, or in favor of any other lienor, which would defeat or impair the mortgages which became the subject of foreclosure. If all parties in interest, therefore, were made parties to the foreclosure action, their interest must bow in subordination to the lien of the defendant. In this respect there was nothing which Phyfe & Campbell could do or omit to do which would in the slightest degree present or remove any legal obstacle standing in the way of the defendant's procuring its judgment of foreclosure and enforcing the same. The lienors, therefore, as well as Phyfe & Campbell, could interpose no obstacle to defendant's obtaining judgment, as it will not be presumed that they would attempt to assert a defense when no defense existed to assert. So that as to all parties, aside from the nonresident, and as to her by invoking the remedy appropriate thereto, the defendant could have proceeded to judgment and sale, standing entirely upon its legal right. It is therefore of little consequence that Phyfe & Campbell omitted an answer, or that they took steps to induce other lienors to desist therefrom.

The questions of fact, therefore, narrow themselves to a consideration of whether the evidence shows a contract was made, and, if so, was the appearance of the nonresident procured by Phyfe, did he procure the lease ready to be delivered, together with consents for the extension of the claims of subsequent lienors, and could the hotel itself be completed and furnished as a first-class city hotel by September 1, 1888? So far as the first of these questions is concerned, we think the evidence was sufficient to warrant the jury in finding that a binding contract was entered into between the parties, and that the case in this respect was properly submitted to the jury. We also think the evidence was sufficient for the jury to find that Phyfe procured the appearance of his wife and of Mrs. Campbell in the foreclosure suit. Whether in other respects he fulfilled the contract is not

so clear.   Before or after the letter of April 12th, which we have quoted, a corporation was formed called the "Plaza Hotel Company, Limited," which was organized for the purpose of leasing the hotel when completed.   Prior to the creation of this corporation there had been negotiations between Phyfe & Campbell and the various lienors with other parties to enter into a lease, and such negotiations were the subject of conversation between Phyfe and the defendant, and much testimony was given relating thereto.   But all this failed, and the case came to rest upon the lease executed by the Plaza Hotel Company as the one answering the requirements of the contract. John A. Amundson was the attorney for Phyfe & Campbell, and represented them upon the negotiations with all the parties.   Upon the 12th day of May, 1888, Mr. North delivered to Mr. Amundson the agreement of the defendant of April 12, 1888; the consent of the bondholders, represented by Charles A. Peabody, as trustee of the mortgage, not to enforce the payment of their mortgage for five years from September 1, 1888, if the lease of the hotel was made, containing a covenant for the application of the rents to the payment of current interest upon the bonds, after said 1st day of September; also consent of John C. Anderson to extend enforcement of his mortgages for the period of five years from September 1, 1888, conditioned upon the execution of a lease by the hotel company containing a covenant to pay him $5,000 a year during the first five years, and $10,000 a year for the next five years, payments to be made semiannually after said September 1st.   These papers were delivered to Mr. Amundson upon condition that, if a lease was made and interchanged between Phyfe & Campbell and the Plaza Hotel Company, containing covenants for the payment mentioned in the consents, or that a contract was made and interchanged between Phyfe & Campbell and certain named parties interested in the hotel company for such a lease, these consents should be delivered to Phyfe & Campbell; otherwise to be returned to North.   Subsequently, and on June 30, 1888, Anderson executed another agreement, to extend payment of his mortgages for a period of 20 years.   But this paper never left Mr. North's hands. On June 12, 1888, a lease of the hotel property was made and executed by Phyfe & Campbell and by the Plaza Hotel Company.   This lease was delivered to Mr. Smith, the attorney for the hotel company, to be held by him in escrow to await the delivery of the agreement by the defendant and by the other parties in interest, in accordance with the terms of the contract.   The lease was never delivered as an existing agreement.   Subsequently, on July 12, 1888, the Plaza Hotel Company passed a resolution discontinuing for the present all negotiations in reference to leasing the Plaza Hotel from Phyfe & Campbell, and the secretary was directed to inform Phyfe & Campbell of such action, and also its stockholders.   The negotiations thus terminated were never resumed, and no lease was ever made and delivered.   About the 10th of June, 1888, Amundson left with Welch a proposed agreement for the defendant to execute.   This paper was delivered to Mr. Bogert, the attorney for the defendant, who redrafted it, and it was then taken by Amundson to Welch and left with him to

examine. Amundson testified that subsequently he called upon Welch, but failed to get the executed agreement; that on June 20th he received a letter from the defendant in consequence of which he called upon Bogert, and was there presented with an agreement executed by the defendant, but different from the prior draft, in that it required the immediate payment of the sum of $20,000; that he protested against this change, stating that his parties would not be able to pay it, and the hotel people would not consent to it. Amundson also states that he left with Bogert a copy of the lease of the hotel, as he thought, prior to his reception of the letter of June 20th. · This letter was written by Welch, and stated that up to that time no lease of the Plaza Hotel had been shown to the defendant or its attorney; that it had no knowledge of who the parties were or of their responsibility; that legal expenses had not been attended to; that a change in the contract had been made, and would have to be accepted by the parties to the lease; that they would give them until Saturday, the 23d inst., at 10 a. m., to be satisfied upon these points, after which time, unless satisfied, the defendant would feel at liberty to withdraw from any agreement with the parties. It does not appear that any other consents or agreements were requisite, except as we have herein referred to. It is clear from this recital that the position of the respective parties to the negotiation was that each had fulfilled its contract, and each charged the other with its breach. Upon this point Phyfe testified that all consents required by the defendant had been obtained, that the lease was executed and awaited delivery immediately the defendant executed its contract, and .that by reason of the latter insisting upon a change in the contract at the last moment the whole scheme was defeated. The testimony of plaintiffs in this regard rested substantially upon the testimony of Phyfe, corroborated in some slight particulars, and by Amundson's statement. Bogert was not called. The · defendant, however, claims that this refusal, if made, had no effect whatever upon the action of the hotel company, which was based upon entirely different grounds and upon matters for which Phyfe & Campbell were alone responsible. We have seen what steps were taken, in their order, and plaintiffs' claim, and the testimony to support it.

We must now examine the testimony upon which the defendant relies. Mr. Smith, the attorney for the hotel company, states that he had numerous interviews with Mr. North in regard to Anderson's consent; that on the 16th day of June, 1888, he examined the proposed agreement of Anderson, and rejected the same as not in accordance with what Phyfe & Campbell had promised to procure; and that he had arrived at no understanding with Anderson or his attorney prior to July 30th. Mr. North states that about June 12th he was informed by Phyfe & Campbell or by Mr. Amundson that the contracts were not satisfactory, and that the hotel company would not deliver the lease unless further agreements were made by Mr. Anderson, and that for a period of about a month negotiations were going on for obtaining better terms from him; that the agreement of Anderson which was delivered to Amundson was never

accepted by the hotel company, and the same was subsequently de-
livered back to him; that the agreement of June 30th was not ac-
cepted, and he always retained possession of it, and that no agree-
ment had been accepted from Anderson, either prior or subsequent
to the passage of the resolution by the hotel company.   Mr. Ham-
mond, the president of the hotel company, testified that he did not
recollect any action of the defendant which caused the passage
of the resolution declining further negotiation with Phyfe & Camp-
bell, and he stated his recollection to be that the reason for its
adoption was that they did not think Phyfe & Campbell could per-
form the obligation that they had undertaken, to complete the hotel
by the 1st of September, 1888.   No steps were taken by the de-
fendant to enforce the judgment by sale until after the 24th day
of July, 1888, when it was informed of the passage of the resolu-
tion of the hotel company by Mr. North, and notice of sale was not
then given until a week later.   The bare recital of these proceed-
ings and this testimony clearly shows that whether the action of
the hotel company was based upon the act of the defendant in in-
sisting upon its modified agreement, assuming that it had no right
so to do, and did so, or whether it was based upon the unsatisfac-
tory character of the consents which were tendered by Anderson,
or whether it was due to a belief by the hotel company that Phyfe
& Campbell could not complete the building by the 1st of Septem-
ber, presented questions of fact, and from this testimony the jury
was to make answer who was the party responsible for the fail-
ure.   This was one of the questions submitted to them, and by their
verdict the defendant was exonerated.   Instead of the verdict in
this respect being against evidence, it was based upon evidence of
a controlling character.

But there is another question in this case which furnishes a com-
plete answer to plaintiffs' appeal, so far as the breach of this con-
tract is concerned.   We do not propose to set out the evidence in
detail bearing thereon, although we have gone over the whole rec-
ord with painstaking care.   The application by Phyfe & Campbell
for the second loan contained a statement that the first loan had
been granted upon the understanding that a first-class fireproof
building would be erected.   The terms of the agreement omitted the
statement "fireproof," but it provided that the parties to said lease
should complete and furnish the Plaza Hotel in a manner suitable
to a first-class city hotel by September 1, 1888.   Phyfe testified
that he had made arrangements to obtain money, and could have
completed the hotel by September 1st, had it not been for the de-
fendant's refusal to execute the contract, and its act in noticing
the premises for sale under its judgment, which latter act had the
effect of stopping the work, and he was unable thereafter to proceed
with the construction; that the structure, so far as he had proceed-
ed, and as he left it, was a strictly first-class fireproof construction,
complete in all particulars.   He was somewhat corroborated by
examinations which were had at a time prior to the granting of the
second and third loans, while the building was in process of con-

struction, and by some expert testimony relating to a small portion of the work. The defendant called 10 witnesses, most of whom were disinterested, who testified as to the condition of the building when it was abandoned by Phyfe & Campbell. This testimony tended to establish that the construction was not fireproof and in no sense first-class. On the contrary, that in many respects it was faulty to an extent which rendered it insecure and unsafe, especially in the foundation walls. Some of the witnesses characterized it as dangerous, and erected in disregard of the ordinary principles of construction. In addition to this, the defendant produced photographs of the foundation walls and other parts which showed very serious defects, and testimony was given tending to establish that the defendant, after the sale, entered upon the completion of the building, and was compelled to remove almost the whole of the interior construction from the foundation, and reconstruct the same, and that it paid out for reconstruction the sum of $940,000, and to complete the structure, including the last item, the sum of $1,800,-000. The amount advanced to Phyfe & Campbell was $860,000, making a total amount which the defendant put into this structure of $2,660,000. The question whether Phyfe & Campbell had complied with this clause of the contract was submitted to the jury under a charge to which no exception was taken, and the finding was against the plaintiffs. It is idle to discuss whether this finding, based upon such testimony, can be disturbed.

We find no error in the rulings upon the trial or discussion thereof necessary. They are very numerous, and we have examined them all with care, as well as the discussion of counsel in respect thereto. Any attempt to set out our reasons for reaching this result would prolong a discussion without the accomplishment of a useful purpose. It is evident from this record that the venture of Phyfe & Campbell was most disastrous, not only to themselves, but to all concerned. The finding of the jury, based upon sufficient testimony to uphold it, leaves plaintiffs' claim in this condition: The fixed charges which rested upon the property on the 18th day of September amounted to $1,674,741.10. The land was only worth, at the highest estimate of any witness, $1,200,000. Thus there was left a deficiency which Phyfe & Campbell were to pay, in any event, over the value of the land, of $474.741.10. The claim was that land and building were worth $2,000,000. But to complete the building as contracted for required $1,800,000 additional, and if we add thereto the difference in amount between the sum of the liens and the value of the land, i. e. $474,741.10, we find that it exceeds the value of the land and building as claimed by the plaintiffs by $274,741.10. This result makes it difficult for us to see how plaintiffs have suffered any damage, in view of the finding of the jury, and which we find no ground for disturbing. The amount involved is our only apology for this extended discussion.

It follows that the judgment should be affirmed, with costs. All concur.